**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------- x

M.K., a minor, by and through her mother Sharmila
Surujnath,

Plaintiffs,

-against-

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF EDUCATION, and NEW YORK
CITY POLICE DEPARTMENT,

Defendants.

--------------------------------------------------------------------- x

Index No. _____

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff M.K., a minor, by and through her mother and next friend Sharmila Surujnath,

brings this action against Defendants the City of New York, the New York City Department of

Education ("NYC DOE"), and the New York City Police Department ("NYPD"), and alleges as

follows:

## PRELIMINARY STATEMENT

1.      Plaintiff M.K. was a 15-year-old ninth grade student at John Adams High School

in Queens County, New York ("John Adams") when, on January 31, 2023, uniformed officers of

the NYPD subjected her to an unlawful strip-search.  The strip-search violated M.K.'s federal

statutory and constitutional rights under the United States Constitution's Fourth and Fourteenth

Amendments.  M.K. brings this civil action to seek legal and injunctive relief to address her injuries

arising from this illegal search and other related misconduct perpetrated by subordinates,

representatives, and/or employees of the NYPD and the NYC DOE.

1

2.      John Adams is a "scanning school," requiring students to pass through metal detectors each morning to gain entry.  NYPD officers act as the school's security guards.  The scanning equipment is old and erratic, and the NYPD officers are poorly trained and largely unsupervised.  When the scanning equipment is tripped, the NYPD decides which students get waived through and which will be subjected to additional, more intrusive searches, including searches in a private room, surrounded by uniformed officers.

3.      M.K. is a model student with no disciplinary record.  Beginning in December 2022, NYPD officers confused her with another student who had been caught smuggling vaping equipment into school and began targeting her for needless, escalating searches. On two occasions in December 2022, M.K. was brought into a private room because she purportedly tripped the metal detectors, even though she had no contraband and had been waived through in the past, without incident, while wearing the same clothing.  M.K. was surrounded by NYPD officers demanding that she turn over contraband, even though she had none on her person.

4.      On both occasions, the school called her mother, Ms. Surujnath, who came to the school.  The first time, the school required M.K. to go home and change her clothes.  The second time, after Ms. Surujnath had arrived and M.K. was scanned again, an NYPD supervisor confirmed that an underwire in M.K.'s bra was tripping the scanner and allowed M.K. entry into school.  Ms. Surujnath's written complaints to the school after each of these incidents were largely ignored and her request that M.K., now in fear of the scanning process, be excused from it was rejected.

5.      On January 31, 2023, M.K. again was wrongly targeted as a previously caught vape smuggler.  She was brought into the private room, but this time no call was made to M.K.'s mother. A different NYPD officer from the prior incidents instructed M.K. to lift her shirt.  Sensing M.K.'s understandable hesitancy to reveal herself, the officer commented that those in the room were all

women and were not looking at M.K. "like that."  An intimidated M.K., cornered and not knowing

her rights, reluctantly lifted her shirt, exposing her body to those present.

6.      John Adams Dean Jessica Sirakowski was in the room at the time, purportedly as

an *in loco parentis* supervisor.  She said nothing.  She allowed M.K. to be strip-searched.  Seeing

no contraband, M.K. was then sent to her class.  In a telephone call about an hour later to Ms.

Surujnath, Dean Sirakowski apologized and admitted that school policy had been violated.

7.      Both the Chancellor's Regulations for the NYC DOE and the NYPD Patrol Guide

expressly prohibit strip-searches of students, for good reason.  As the United States Supreme Court

observed in *Safford Unified Sch. Dist. No. 1 v. Redding*,

> [B]oth subjective and reasonable societal expectations of personal privacy
> support the treatment of [a strip search] as categorically distinct, requiring
> distinct elements of justification on the part of school authorities for going
> beyond a search of outer clothing and belongings.…  [Strip searches can be]
> embarrassing, frightening, and humiliating….  [T]he categorically extreme
> intrusiveness of a search down to the body of an adolescent requires some
> justification in suspected facts….  and [absent some] indication of danger
> to the student … the strip search [is] unreasonable.

557 U.S. 364, 370-77 (2009) (internal quotations and citations omitted).

8.      NYPD officers had no reason to suspect that M.K. posed any danger to herself or

anyone at the school, nor any reasonable suspicion that she was committing a crime or violating

any school rule.  The strip-search violated M.K.'s constitutional rights.

9.      While M.K. was still reeling from what had just happened to her, Dean Sirakowski

pulled her out of class and forced her to write a written statement.  Before M.K. could put pen to

paper, Dean Sirakowski sought to influence what she would write, repeatedly pressing M.K. on

whether she was "completely sure" she heard the officer instruct her to lift her shirt.

10.     The pattern of harassment and the events of January 31, 2023 caused M.K.

immediate and severe emotionally injury:  anxiety, difficulty sleeping, the shakes, and stomach

pain.  She missed the next three days of school.  And when she returned to school the following week, she experienced her trauma again as she was forced to go through the security scanning process, wondering what would happen that day.  She visited multiple doctors to seek treatment for her anxiety and the physical manifestations arising therefrom.

11.     Ms. Surujnath's prompt pleas to school officials—and even to New York's Special Commissioner of Investigation ("SCI")—to allow M.K. to be excused from scanning, or to have alternative procedures established to minimize further injury, were either rejected, ignored, or whitewashed.  M.K.'s emotional distress continued for the rest of the school year.

12.     The summer 2023 recess has offered M.K. a temporary reprieve, but she will begin a new semester soon.  With the Defendants refusing to take action, even after injuring her unlawfully, M.K. has been forced to seek relief in this Court.

## JURISDICTION AND VENUE

13.     This action arises under the Fourth and Fourteenth Amendments to the U.S. Constitution and under 42 U.S.C. § 1983.

14.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, as this action seeks redress for violations of Plaintiff's rights under a federal statute and the U.S. Constitution. This Court has supplemental jurisdiction over the Plaintiff's claims arising under the laws of the State of New York pursuant to 28 U.S.C. § 1367.

15.     This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in the Eastern District of New York.

16.     Plaintiff has exhausted administrative remedies by fully complying with New York General Municipal Law § 50-e, serving a Notice of Claim on April 17, 2023 on the New York City Comptroller's Office via certified mail to 1 Centre Street, Room 1225, New York, NY 10007.

4

The Notice of Claim, which set forth in detail the misconduct and legal violations described herein, was signed for by the Comptroller's Office (*See* Ex. A, Certified Mail Confirmation.)

17.    Defendants' 30-day statutory response period under New York General Municipal Law § 50-e expired on May 17, 2023.  Defendants did not respond to the Notice of Claim during the response period or at any time thereafter.

18.    Plaintiff's legal counsel made multiple attempts by phone to contact the Comptroller's Office to find out why no response had been made.  Those efforts were ignored. Counsel's June 29, 2023 email to the Comptroller's Office bureau responsible for such claims was also ignored.  (*See* Ex. B, 6/29/21 Email.)

## THE PARTIES

19.    Plaintiff M.K. ("M.K.") is a 15 year-old minor residing in Queens County, New York.  M.K. brings these claims by and through her custodial parent, Sharmila Surujnath,

20.    Defendant City of New York is a municipal corporation and a political subdivision of the State of New York.

21.    Defendant New York City Department of Education ("NYC DOE") is a public agency operating under New York City and State laws.  The NYC DOE's headquarters is located at 52 Chambers Street, New York, NY 10007.

22.    Defendant New York City Police Department ("NYPD") is a public agency operating under New York City and State laws.  The NYPD's headquarters is located at 1 Police Plaza, New York, NY 10038.

## FACTUAL BACKGROUND

23.     M.K. is a high school student at John Adams, a "STEM" school (science, technology, engineering and mathematics) located at 101-01 Rockaway Blvd., Queens, NY 11417. She started at John Adams, in the ninth grade, in the fall of 2022.

24.     John Adams offers M.K. an academic opportunity that would not be available at other schools.  John Adams advertises its STEM Academy as a program "designed to give a broad overview of engineering disciplines, and to unlock the potential of computer and virtual reality tools. . . ."  M.K. hopes to become a civil engineer.

25.     Ms. Surujnath is an alumnus of John Adams and a single mother with two children. The school is located near their home, making it convenient for her to drive M.K. to John Adams on her way to work each day.  Ms. Surujnath has intended to send M.K.'s younger brother to the school when he reaches high school age.

26.     Going to John Adams should have been a positive experience for M.K.  Instead, just months into her education, she was traumatized by the security procedures she was forced to navigate each morning when entering school.

## JOHN ADAMS' SECURITY PROCEDURES

27.     John Adams requires students to go through entry procedures which are problematic in many respects.  Poorly trained, rotating NYPD officers are left with wide discretion to subject students to arbitrary and harassing treatment.

28.     A single school official is often posted in the area of the cafeteria.  During the period at issue, that official typically was either Dean Sirakowski, Dean Shirlene Jean-toussaint, or Dean Denisa Mejia.

29.     The Deans are usually present, but they do not take any actions to supervise the NYPD officers, who appear to operate independently of any school supervision and report to their own superiors in the NYPD.

30.     Nor do the Deans pay much attention to the scanning process.  While typically present in the area, they often pay more attention to their cell phones than to the screening process.

**Phase 1 – Metal Detectors**

31.     All students are required to enter John Adams each morning through a side door that leads to the cafeteria.  They must empty their pockets, place their bags on a scanner, and walk through one of three metal detectors, referred to as Phase 1 of the security process.

32.     The metal detectors are manned by uniformed NYPD officers; some scan the students' belongings and some scan the students.

33.     The metal detectors are in poor condition.  They are different from ones commonly used in government buildings, courthouses, or airports.  When metal is detected, they do not ring, buzz, or light up in a way that can be seen or heard by the person being scanned.

34.     After walking through the machines, NYPD officers tell the students whether they are cleared to enter the school.  When informed that the detector has been tripped, students are either instructed to remove objects from their person and go through a metal detector again, or to go to a separate area where "hand-wanding" takes place.

35.     Students endure wildly inconsistent treatment from NYPD officers at the metal detectors.  Whether due to their sensitivity settings, selective enforcement by the NYPD officers, or otherwise, being flagged for tripping the metal detector is a random process.  On occasion, a student who is flagged after going through one metal detector is sometimes instructed to try one of the other two, and then permitted to go into the building.

36.     On multiple occasions, M.K. has been flagged for purportedly tripping the metal detector even though she is wearing *the exact same outfit* she had worn a few days before without being flagged.  There is no precision or consistency to the scanning determinations.

37.     In M.K.'s experience, whether she gets flagged depends more on which NYPD officer is monitoring the metal detector than on what she is wearing.  And with no audible or visual indication as to whether the detector has even been tripped, there is no way for her to verify whether an officer's decision to allow her through, or to require her to go through further screening, is connected to whether the metal detector has actually detected any metal.

**Phase 2 – Hand-Wanding**

38.     When an NYPD officer decides to escalate the scanning of a student, the officer escorts the student to a separate area for what is referred to as Phase 2 of the security process: hand-wanding.  A large wand is used to scan particular areas of the student's body.  The hand-wanding is performed at the entrance to the cafeteria, in plain view of students going through the metal detectors and students who have passed through security and are waiting to enter school.

39.     Unlike the metal detectors, the hand wands are sometimes set to audibly beep, presumably when they have detected some type of metal.

40.     When the wand results in a beep, officers will either challenge the student to remove hidden metal objects and try again, let the student pass, or inform the student that it is time to move onto Phase 3 – a search in a private room.

41.     The results at hand-wanding are also random.  NYPD officers have wide discretion to decide whether to let a student enter the school.   As with the metal detectors, whether a student who trips the hand-wanding is allowed to pass is, in M.K.'s experience, often based more on which security guard is making the decision than on the results of the hand-wanding.

**Phase 3 – Private Room Search**

42.     When a student is told that they have not cleared hand-wanding, they are escorted to Phase 3, a small room in the cafeteria.  The student generally is escorted by one or two officers to the room.

43.     M.K. only knows what happens inside the private room in a Phase 3 search based on her own experiences, which are described below.   Upon information and belief, however, when a student is taken to the Phase 3 room, the school Dean on duty generally is summoned to be present in the room, along with the officer in charge of Phase 3 for the day.

## M.K.'s PHASE 3 INCIDENTS

**Incident 1:  December 14, 2022**

44.     M.K.'s initial experience with Phase 3 came on December 14, 2022.  She was wearing cargo pants, a tank top and a hoodie.  After going through the metal detector, the officer on duty told her that she had been flagged and instructed her to walk through again.  After M.K. did so, the officer yelled at her, "You're that girl with the vape."

45.     While the NYPD officers are certainly scanning for weapons, in M.K.'s experience, they are preoccupied with looking for students who try to smuggle vaping equipment into the school.

46.     And M.K. was *not* that girl with the vape.  M.K. had not been caught smuggling a vape into school.  Upon information and belief, the officer had confused M.K. with another student.

47.     M.K. told the officer that she must be confusing her with another student.  But M.K. was nonetheless brought to the hand-wanding area for a Phase 2 search.  The officers began to hand-wand M.K. and the wand emitted a beep when it passed over M.K.'s waist.

48.     The NYPD officers challenged her to turn over what she was hiding in her waistband.  M.K. denied that she was concealing any items in her waistband.  The officers then instructed her to proceed to Phase 3.

49.     Upon arriving in the Phase 3 room, M.K. was again hand-wanded (with a smaller wand).  After stating again that she was not concealing anything, she was advised that she could not enter the school and instructed to wait while the school contacted her mother.

50.     The school contacted Ms. Surujnath and told her that M.K. would not be allowed to attend school until she went home to change into clothing that would not trip the metal detector sensor.  Ms. Surujnath was on the way to work.  She drove back to the school.

51.     Just having to wait in the cafeteria for her mother to leave work and come to the school caused M.K. anxiety.  She had done nothing wrong, but uniformed NYPD officers had accused her of misconduct.  She was also missing school.  And M.K.'s mother was forced to leave work to come get her.

52.     Ms. Surujnath arrived and took M.K. home to change.  M.K. changed only her pants (cargo pants to sweatpants).  When she returned, M.K. passed through the metal detectors and was waived through.

53.     Ms. Surujnath was forced to miss hours of work in the process.  M.K. missed two periods at school.

54.     Ms. Surujnath sent an email at 11:30 am that morning to John Adams Assistant Principal Warren Kaufman.  (*See* Ex. C, 12/14/22 Email).[1]

55.     In the email to Assistant Principal Kaufman, Ms. Surujnath wrote:

---

[1] For confidentiality purposes, M.K.'s full-name is redacted in each of the exhibits filed herewith.

My daughter was pulled to the back room because the signals kept going off which I understand out of safety issues BUT She was accused by two guards of having vape on her and that she has history of this offense when she never done anything.  My daughter has only been in the school since September and she has not gotten into any trouble.  She has never been pulled into the room until today.  She has issues practically every day where she is being pulled and getting hand wanded.  They seem to have gotten her confuse with another student which is very concerning.

Does the school not have a system in place where they can differentiate kids?  Innocent kids shouldn't have to get treated like criminals because the school can't tell the difference.

I already had spoken to dean Jean Tussaint this morning but it's very troubling and my daughter has a fear now.

56. Assistant Principal Kaufman did not respond to the email.  Ms. Surujnath received a call from Assistant Principal Pashko, John Adams' head of security, who indicated he had seen the email.

57. Mr. Pashko told Ms. Surujnath on this call that M.K. was searched because the officers stated that she had been caught with a vape recently.  Ms. Surujnath reiterated that this was not the case, that the officers were confusing her with another student, and demanded to see a report of any incident involving her daughter.  She also asked Mr. Pashko for the name of the security guard who had accused M.K. of having a vape.

58. Mr. Pashko apparently did not know whether the NYPD officers had properly identified M.K. as the student who had been caught with a vape, even though he is in charge of security for the school.  Mr. Pashko did not claim that he, the school, or the NYPD had any evidence that M.K. had done anything wrong.  Nor was he able to identify by name any of the NYPD security guards purportedly involved in any incident involving M.K.'s possession of vaping equipment.

59. Neither Mr. Pashko nor anyone else affiliated with John Adams has ever provided Ms. Surujnath with a report or any other evidence indicated that M.K. has been involved in a

vaping incident.  Nor did anyone provide Ms. Surujnath with a report, or any other evidence, about any other student who had been caught with vaping equipment.

60.     While on the phone with Mr. Pashko, Ms. Surujnath requested that the school waive the scanning requirement for M.K.  Mr. Pashko responded that "this is a scanning school" and indicated that M.K. would need to transfer to a different school to avoid being scanned.

61.     From these events, Mr. Pashko was on notice that the scanning procedures at the school, presumably under his supervision as head of security, were not working properly.

62.     An innocent girl, M.K., had been wrongly identified as a problem student.  NYPD security guards had subjected her to multiple searches not because they had reasonable suspicion that she was breaking the law or school rules, but because they erroneously believed she was a student likely to conceal a vaping device on her person.

63.     Mr. Pashko was on notice that a failure in reporting or record-keeping about problem students had led to a mistaken identification.

64.     Assistant Principals Kaufman and Pashko were on notice that the failures of its security detail had already caused M.K., an impressionable, young, new student, to be afraid.

65.     A reasonable head of security would have taken steps to ensure that problems in the security procedures at John Adams would be addressed so these events would not repeat.  Upon information and belief, no steps were taken.

**Incident 2 – December 21, 2022**

66.     Forced to continue going through the school's scanning procedures, M.K. barely made it one week before a second "Phase 3" incident occurred.

67.     On December 21, 2022, M.K. was again informed by an NYPD officer that she had been flagged by the metal detector.  On that day, M.K. was wearing the identical outfit—leggings, a tank top, and a hoodie—that she had worn before and had passed through security with no issue.

68.     As with the incident on December 14, M.K. was accused of hiding a vape on her person with no reasonable basis to suspect her of doing so.

69.     M.K. was sent to Phase 2, where hand-wanding resulted in beeping around M.K.'s chest area.  M.K. told the officers that she was wearing a bra with an underwire that was likely being detected.

70.     The officers did not care.  They sent her to Phase 3.

71.     Once inside the Phase 3 room, M.K. was hand-wanded again with a smaller device. She was again challenged to turn over the vape she purportedly was hiding.  M.K. repeated that she had no vape and was concealing nothing.

72.     M.K. was again forced to wait for her mother to pick her up at school.  Ms. Surujnath was contacted and, like before, came back to John Adams.

73.     This time, while at the school, Dean Jean-toussaint agreed to allow Ms. Surujnath to go down to the cafeteria to walk through the scanning area.  During the walkthrough, Ms. Surujnath asked whether the school kept an incident log for their screening procedures. Dean Jean-toussaint admitted that the school keeps no log of students who were escalated to Phase 2 or Phase 3, nor a log of students found to have contraband.

74.     M.K. was scanned again in the Phase 3 private room, this time with Ms. Surujnath in the room.  It was obvious to Ms. Surujnath and, on information and belief, to others in the room that the wand was beeping when it passed the area of M.K.'s underwire bra.

75.     Ultimately, the officer supervising Phase 3 located a man, also dressed in an NYPD uniform, but wearing white instead of blue.  Upon information and belief, this man, who did not identify himself, appeared to be a supervisor for the NYPD officers at the school or in the area.

76.     Ms. Surujnath then overheard the man consulting with the officer in charge of Phase 3, asking her to describe the beeps that had caused M.K. to be flagged, including asking whether it was a short beep or a long beep.  Upon being told it was two beeps, he said "it's the bra."  At that point, M.K. was authorized to enter the school; she did not have to go home to change.

77.     The conversation, however, continued.  By this time, Assistant Principal Pashko had arrived on the scene.  The officer in charge of Phase 3 asked Mr. Pashko, "Aren't you going to tell the mom what she needs to know about her daughter?"  Mr. Pashko then reported that one of the officers had told him that M.K. "had been caught the day before with a vape."

78.     Ms. Surujnath responded, "are you kidding me?"  She told Mr. Pashko that no one called her or notified her about any such incident from the prior day.  Ms. Surujnath asked if the school or NYPD had a record that reflected a student name or identification for the incident they were describing so that it could be compared to M.K.'s identification.

79.     Mr. Pashko then stated that the school had no record of the prior incident, but that they were going to start keeping a log based on Ms. Surujnath's suggestion.

80.     Ms. Surujnath then overheard Assistant Principal Pashko talking to the NYPD officers, stating that he had never heard of any incidents involving M.K. and that he wanted it to be clear that he had nothing to do with this.

81.     Assistant Principal Pashko is *the head of security for John Adams*.  This is the second time he had been made aware that NYPD offices had targeted M.K. for harassing treatment

14

and searches because she had been mis-identified as a student who had been caught smuggling contraband into the school.

82.     It was apparent from Mr. Pashko's conduct and statements that he suspected the NYPD had failed to exercise its duty by misidentifying M.K. and by failing to keep records sufficient to identify students who had been caught with contraband.  But instead of taking action to protect M.K., he seemed more interested in protecting himself, telling the NYPD officer that *he had nothing to do with this*.

83.     Upon information and belief, Mr. Pashko again failed to take reasonable steps to correct the problematic security and scanning procedures at John Adams which were already injuring M.K.

**Incident 3 – January 31, 2023:  The Unconstitutional Strip Search**

84.     On January 31, 2023, when M.K. went through the metal detector, she was told it went off.  The NYPD officer on duty said, "We're not doing this today.  Take out whatever is on you.  I'm not sending you over there [to Phase 2] today."

85.     M.K. responded that she had no metal to remove.

86.     The guard told her to go to the side, fix herself, and come back.

87.     After going through the metal detector again, M.K. was told to go Phase 2.

88.     The Phase 2 officers told M.K. that the hand-wanding resulted in beeping.  M.K. responded that she was wearing an underwire bra, and that was probably the reason she was being detected as having metal, hoping they would allow her to enter school with that explanation (as she ultimately was allowed to do on December 21, 2022).  The officers then sent M.K. back to the metal detectors, instructing her to remove her hoodie and walk through again, and told M.K. that she had again been flagged.

89.     Despite her sensible explanation, and having no metal on her person, M.K. was directed to Phase 3.

90.     M.K. was in the Phase 3 room with an NYPD officer later identified as Officer Lopez and with another officer who was in charge of Phase 3 for the day.  They waited for Dean Sirakowski, the Dean on duty in the cafeteria that day, to be summoned.

91.     After Dean Sirakowski arrived, M.K. was pressed about what she was hiding.  She stated again that she was not hiding anything and that her bra underwire was probably causing the scanners to beep.  One of the officers stated that "girls usually hide vapes in their bra."

92.     Unlike the prior two incidents, when M.K. was brought into the Phase 3 room, the officers did not tell her to wait while they contacted her mother.

93.     Officer Lopez instead instructed M.K. *to lift her shirt*.  Apparently noting the obvious discomfort M.K. had with this instruction, Officer Lopez remarked that everyone in the room was a female and thus "we're not looking like that."

94.     Out of fear, M.K. complied.  She lifted her shirt, exposing her body.

95.     A search that requires a student to remove any or all of his/her clothing, other than an outer coat or jacket, is a strip-search.

96.     In *Safford,* the United States Supreme Court recognized that it is reasonable for a student to be embarrassed, frightened, or humiliated by such a search based on "the consistent experiences of other young people similarly searched, whose adolescent vulnerability intensifies the patent intrusiveness of the exposure." *Safford,* 557 U.S. at 375, *citing* Hyman & Perone, The Other Side of School Violence:  Educator Policies and Practices that May Contribute to Student Misbehavior, 36 J. SCHOOL PSYCHOLOGY 7, 13 (1998) (strip search can "result in serious emotional damage").

97.     The *Safford* Court even cited New York's restriction on strip searches:

> [E]xposing for a search in responding to an accusation reserved for
> suspected wrongdoers is fairly understood as so degrading that a number of
> communities have decided that strip searches in schools are never
> reasonable and have banned them no matter what the facts may be, see, *e.g.,*
> New York City Dept. of Education, Reg. No. A-432, p. 2 (2005) ("Under
> no circumstances sha a strip-search of a student be conducted").

*Id.*

98.     Dean Sirakowski, presumably in the room to supervise or protect M.K. from being

alone with the NYPD officers and to ensure that NYC DOE regulations would be followed, did

nothing.  She remained silent and watched M.K. being strip-searched.

99.     Seeing no vape in her bra – just an underwire – M.K. was then cleared to head to

class.  She did so in shock.

100.    After M.K. arrived in class, still reeling from being strip-searched for no reason,

she was pulled out of class by Dean Sirakowski.  M.K. then went to Dean Sirakowski's office, and

Dean Sirakowski called M.K.'s mother.

101.    During that call, Dean Sirakowski described to Ms. Surujnath what had happened

with her daughter, apologized, and admitted that the search that had been conducted was against

school policy.  Dean Sirakowski also mentioned during the phone call that the school would be

filing a complaint with the SCI and that Assistant Principal Pashko would draft the paperwork.

She then let M.K. talk to her mother on the telephone.

102.    Following this conversation, Dean Sirakowski told M.K. to return to class.

## M.K. IS FORCED TO WRITE A STATEMENT

103.    After returning to class, M.K. was pulled out of class a second time.  This time,

Dean Sirakowski was joined by Assistant Principal Pashko, who was taking notes at a separate

table.  Dean Sirakowski began questioning M.K. about whether she was *sure* she heard the officer

instruct her to lift her shirt.

104.    Dean Sirakowski had been in the room when M.K. was told to lift her shirt.  She

already had apologized to M.K.'s mother and had admitted that what had happened was against

school policy.

105.    If Dean Sirakowski honestly believed that M.K. had decided to lift her shirt on her

own, she would not have apologized or made that admission.

106.    After being asked multiple times if she was "sure," M.K. was then instructed to

write a statement describing the incident.  She was handed a form and told to write.

107.    This was an intimidating and stressful event for M.K.  Adults who were supposed

to be protecting her, like Dean Sirakowski, were now suggesting that she had mis-heard Officer

Lopez:  that what had happened might have been M.K.'s fault.

108.    Dean Sirakowski's questioning was not the last M.K. would endure that day as she

was soon pulled out of class again – for the third time – to discuss what she had written in her

statement with Assistant Principal Pashko.

109.    Ms. Surujnath was not advised, when she was on the telephone with Dean

Sirakowski earlier or at any other point, that M.K. was going to be told to prepare a written

statement.  Nor was M.K. told that writing the statement was optional.

110.    The "security team" at school made her write that statement while simultaneously

pressuring her to move off a story that would look terrible for the school, even though it was what

had actually happened.   Someone at that school apparently decided that it was time to attempt to

minimize *the school's* damage, caused by its failure to properly supervise the security process.

The actions they took were at the direct expense of M.K., the 15-year-old girl they had just allowed to be traumatized by an illegal strip-search.

111.    Ms. Surujnath did not receive a copy of the written statement until weeks later, after she sent an email requesting it.  The statement itself corroborates that M.K. had been improperly influenced to equivocate about being instructed to lift her shirt.  (*See* Ex. D, Statement.)

112.    M.K. wrote "I wasn't completely sure if she said to lift up my shirt so the administration can see if there's anything that I tucked in my bra, but that's what it sounded like to me, so I did it."  *Id.*

113.    The words reflect the uncertainty Dean Sirakowski was attempting to inject into what happened, but M.K. could not bring herself to deny that she heard an instruction to lift her shirt.

114.    A section later in M.K.'s written statement removes all doubt about what actually had happened in that room.  She wrote, at the end of her statement, that the NYPD officer "said something like we are all female/women in here.  So we are not looking at you like that."  *Id.*

115.    There would be no reason for Officer Lopez to have said anything of the kind had she not told M.K. to lift up her shirt.  Such a statement would have made no sense if M.K. had somehow misheard Officer Lopez and lifted her shirt without being instructed by a uniformed police officer to do so.

116.    Under the circumstances, the demand that M.K. provide a written statement was the equivalent of a custodial interrogation, of a minor, undertaken outside the presence of her legal guardian, and without advising her of her rights.

**THE SCHOOL IGNORES REQUESTS TO PROTECT M.K. FROM FURTHER INJURY**

117.    Following the January 31, 2023 incident, M.K. could not sleep.  She had anxiety about having to go through the metal detectors.  Her hands and legs would shake and she experienced stomach pain.  She missed the next three days of school (although she was inaccurately marked "present" on February 1, 2023).

118.    When she returned to school on February 6, 2023, M.K. was anxious about going through screening.  She managed the best she could, but the physical manifestations of her emotional distress got worse, and as the week continued, she began to break out with rashes.

119.    On February 7, 2023, Ms. Surujnath wrote an email to Dean Sirakowski and Assistant Principal Pashko, pleading with them to help relieve M.K. of her anxiety. (*See* Ex. E, 2/8/23 Email Chain):

> This is regarding the incident with my daughter . . . on 1/31.  Since that incident, [she] has been stressed and scared of going through the metal detectors and dealing with the safety officers.  This has been ongoing concern since this is the 3rd incident already.  I wanted to reach out and see if there was alternative process for the scanning.  Is it possible that she can report to a school administrator in the morning instead of going through metal detectors?  I understand it's school procedure but at the same time, it's not suppose to [sic] be [a] traumatizing procedure.
>
> She has been very traumatized with this whole incident and she's worried in the morning about the scanning issue.  Any help to make this process easier so she can start to feel safe again in school would be appreciated.  Kindly let me know.  Thank you.

120.    Assistant Principal Pashko responded the next day, stating that he does "empathize and have sympathy for the traumatic event" M.K. went through, but "[u]nfortunately, John Adams High School is a scanning school," and "we cannot let [M.K.] bypass scanning."  He also stated that one of the Deans would "walk her through the [scanning] process," and that the two Deans on duty and "IB/STEM SLC Leadership team are her support system."  *Id.*

121.    This response suggested that school officials would be looking out for M.K. and helping her through the scanning process.

122.    In offering this response, Assistant Principal Pashko confirmed that John Adams was taking on a duty of care towards M.K. that included protecting her from further improper scanning and screening.

123.    While some effort to adhere to such a program may have been made in the days following Mr. Pashko's response, any such help quickly ended.  For a significant portion of the spring semester, M.K. had no help from the Deans and was sent by the security guards to be "wanded" frequently.

124.    Some days this treatment seemed random:  wearing the exact same outfit purportedly trips the metal detectors on one day, but not on another day.  Some days it seemed targeted, her treatment being driven by which security guard is on duty, much like it was when she was wrongly targeted in January and earlier.

125.    On March 13, 2023, M.K.'s newly retained counsel, Gary Meyerhoff of Dentons US LLP, emailed a letter to Assistant Principal Pashko, hoping to get the school's attention to prompt action to be taken to prevent M.K. from further injury.  (*See* Ex. F, 3/13/23 Letter.)

126.    The letter reminded Mr. Pashko of his email promising that school officials would be "her support system," advising him that M.K.'s treatment during scanning was causing her further injury each day, and demanding that she be removed from the scanning process or that other arrangements be made to minimize further injury.

127.    The March 13, 2023 letter was ignored.  A follow up email to Assistant Principal Pashko on March 20, 2023, asking him just to acknowledge receipt of the letter, was also ignored.

128.    A second follow up email on March 22, 2023, this time to John Adams Principal Pedro Cubero, finally yielded a "response" from Assistant Principal Pashko.  (*See* Ex. G, 3/22/23 Email.)  But Mr. Pashko did not address the issues in Mr. Meyerhoff's email.  He instead wrote:

> Apologies for the lack of communication.  We are in receipt of your letter.  However, we are not authorized to discuss student issues via email.  Attached are the NYC DOE protocols of scanning and school safety.  Have a great day.

129.    Mr. Pashko did not offer to meet with Mr. Meyerhoff in person, refer him to anyone else who might engage, or make any other suggestion as to how M.K.'s critical need for relief from further injury could be addressed.

130.    Upon information and belief, Mr. Pashko's claim that he could not discuss student issues via email was a subterfuge; he and Principal Cubero intentionally chose to evade engaging in a discussion about how to address the ongoing injuries M.K. was incurring at their school.

131.    The NYC DOE protocols Mr. Pashko attached also do not answer the requests made in Mr. Meyerhoff's letter that the school act to minimize M.K's injuries.

132.    Nothing in those regulations prevent the school from making arrangements for M.K. to enter the school without being scanned.  Indeed, the regulations expressly preclude a school from refusing to allow entry to a student that declines scanning.

133.    Chancellor's Regulation A432, "Metal Detection Searches" Section (A)(3) states, "Persons who refuse to cooperate with the scan will be referred to the principal/designee for appropriate action.  Under no circumstances should a student who refuses to cooperate be denied admission or sent home."

134.    Mr. Pashko's repeated statements that John Adams has no choice but to require M.K. to be scanned because it is a "scanning school" cannot be found in, or supported by, the regulations he attached to his email.

135.    Upon information and belief, no NYC DOE regulations or policies require every student to be scanned at a school that scans with metal detectors, regardless of the circumstances.

136.    Each day M.K. came to school in the spring semester, she was faced with fear and apprehension at the prospect of having to go through the school's scanning procedures again. When she was sent to hand-wanding, the fear increased, and that happened often.

137.    As John Adams shows no indication of addressing M.K.'s concerns, she is poised to repeat this process again in the fall semester.

### THE SCI'S AND NYPD'S WHITEWASH OF THE SCI COMPLAINT

138.    As discussed above, M.K. was advised that her written statement on the January 31, 2023 incident was needed because the school was going to submit a complaint to New York City's SCI.

139.    The SCI holds itself out to the public as "the independent watchdog for the New York City School District, that includes the Department of Education."  The SCI purports to be in place to ensure the integrity of the City education system, including through the investigation of complaints about misconduct.

140.    Neither Ms. Surujnath nor M.K. have ever been provided with a copy of any complaint made to the SCI on M.K.'s behalf.

141.    On January 31, 2023, Ms. Surujnath made a complaint to the SCI herself, sending a detailed email, including a narrative description from M.K. on what had happened to her, to the SCI's intake email address.

142.    M.K. and Ms. Surujnath heard nothing about their SCI complaint, or the school's, until March 14, 2023, when Ms. Surujnath received an email – not from the SCI, but from

Lieutenant Emanuel of the NYPD.  (*See* Ex. H, 3/16/23 Email Chain).  The email, entitled "Notification of Findings to Complainant," states:

> Good Morning. This email is to inform you that the reported incident and the investigation, where you were listed as a Complainant, which was carried under NYPD Internal Affairs Bureau log # 23-3970 and SCI complaint # 2023-1007 has been thoroughly investigated and completed. Proper disciplinary actions have been taken/applied.

143.    This email fails to explain why a complaint to the SCI, a "special commissioner" appointed to be a purportedly independent investigator, would end up being handled by the NYPD itself, one of the two City agencies *the complaint accuses of misconduct*.

144.    In New York City, apparently the fox guards the hen house, not the SCI.

145.    Lieutenant Emanuel's vague email, in any event, is hardly a notification of "findings."  It does not state what was done to investigate Ms. Surujnath's complaint, what the outcome of the investigation was, or what actions were actually taken as a result.  It does not even say whether the complaint was found to be valid or invalid.

146.    Ms. Surujnath replied, copying Lieutenant Emanuel's supervisor, and asked for further information.  *Id.*

147.    In response, the NYPD offered a different set of generalities, this time about security and scanning:

> This correspondence is in response to your email. The NYPD is concerned with the safety of all students and therefore all students must go through the scanning process. The scanning program continues to be a vital security initiative and significant deterrent to weapons and violence.
>
> All students and visitors are asked to place all metal objects on their person in their bags, purse or in a plastic tray prior to reaching the screening checkpoint. By adhering to the aforementioned, this might ease the process.
>
> If there are any other concerns regarding scanning, please make arrangements to speak with the school's administrators.

*Id.*

148.    This email was not only non-responsive but was affirmatively insulting and disrespectful.  It implied that M.K. could have avoided being strip-searched if she had just put her metal objects in a tray.  She had no metal objects.  She had been strip-searched in violation of the NYPD's own regulations!

149.    Ms. Surujnath sent another email response, pointing out how the NYPD's refusal to provide details made it look like the NYPD was "attempting to take credit for something that did not even happen – no investigation, no discipline.  Just an attempt to 'handle' a concerned parent with a real complaint about police officers who injured my daughter."  Ms. Surujnath again asked for details about the outcome of this purported investigation.

150.    The NYPD provided no further response to Ms. Surujnath.  The emails it has sent, a clumsy attempt to "handle" legitimate complaints, do little more than whitewash a serious violation of M.K.'s constitutional rights and the NYPD's role in that violation.

151.    It was at a minimum negligent for New York City to allow a complaint against a city agency, the NYPD, to be investigated even in part by the NYPD itself instead of its purportedly independent "watchdog," the SCI.

152.    M.K. does not know if Officer Lopez, or anyone at the NYPD, was disciplined or even ordered to undergo further training for conducting an illegal strip-search.

### M.K.'S INJURIES

153.    The conduct of NYPD officers acting as security guards at John Adams, the failure of school officials to provide adequate supervision over the security process generally, and their failure to heed specific warnings about how M.K. was being improperly targeted for increasingly aggressive searches inexorably led to the illegal strip-search on January 31, 2023.

154.    M.K.'s emotional injury from these events was immediate and included physical manifestations:  feelings of anxiety, trouble sleeping, shakes, stomach pain, and rashes.

155.    With the school refusing to allow her to bypass scanning, or to arrange a safer environment for her to undergo a security check, M.K. re-experienced her trauma each time she entered school.

156.    M.K. is likely to re-experience her trauma again once summer recess has concluded.

157.    M.K.'s symptoms prompted visits to multiple doctors:  a pediatrician, a dermatologist, and an allergist.  Her symptoms have grown severe enough to prompt visits to urgent care.

158.    Upon information and belief, M.K.'s doctors can find no explanation for these symptoms other than the trauma she experienced at school and the resulting stress and anxiety with which she now lives.

159.    Absent relief from the school's scanning processes, or perhaps counseling with a good therapist (elective treatment that her mother will have difficulty affording), there is no basis to expect her anxiety or its physical manifestations will end.

## <u>FIRST CAUSE OF ACTION</u>
### (Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution Pursuant to 42 U.S.C. § 1983)

160.    Plaintiff repeats and realleges the factual allegations contained in paragraph 1-159 with the same force and effect if fully set forth herein.

161.    The Fourth Amendment to the U.S. Constitution states that: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ."  This protection is extended to state governments (and their municipalities, like New York City) through the Fourteenth Amendment to the U.S. Constitution.

162.    The searches described herein were performed by Defendants' subordinates, representatives, and/or employees, were not justified at their inception, and/or were undertaken without the requisite particularized suspicion.

163.    Even if reasonable suspicion had existed at some point to initiate a search or searches of Plaintiff, an adolescent student on school premises (and it did not), the content of the suspicion failed to match the degree of intrusion that Plaintiff experienced.

164.    Plaintiff was subjected to unlawful searches, including a strip-search on or about January 31, 2023, which violated her Fourth and Fourteenth Amendment rights and statutory rights pursuant to 42 U.S.C. § 1983.

165.    The strip-search was also conducted in violation of regulations of the City of New York, the NYPD, and the NYC DOE governing security at schools that, in part, are designed to protect the constitutional rights of students.

166.    Chancellor's Regulation A432(I)(8) states that "[u]nder no circumstances shall a strip-search of a student be conducted."  NYPD Patrol Guide Rule 215-18 provides that "[u]nder no circumstances shall a strip-search of a student be conducted."   Despite these regulations to the contrary, subordinates, representatives and/or employees of Defendants conducted a strip-search of Plaintiff.

167.    The unlawful actions described herein were undertaken by subordinates, employees and/or representatives of the Defendants under color of law and served to deprive Plaintiff of her constitutional rights.

168.    As a direct and proximate result of the actions and omissions of Defendants and their subordinate employees and/or representatives, Plaintiff has suffered and will continue to suffer further injury, including but not limited to emotional distress, and pain and suffering.

169.    Plaintiffs' injuries were caused by (i) the official policies of Defendants, including but not limited the policy of using metal detectors in New York City schools to screen students and of using NYPD officers as school security guards, but failing to include sufficient procedures to ensure the protection of students from unconstitutional searches, and/or (ii) the failure of Defendants as policymakers to provide adequate training or supervision to their subordinates, employees and/or representatives.

170.    Plaintiffs' injuries were exacerbated by Defendants' failure to take corrective action to minimize Plaintiff's emotional distress, either on their own or in response to multiple inquiries and requests that, consistent with the NYC DOE's adopted scanning procedures, no student is required to submit to scanning to be granted entry to school.

### SECOND CAUSE OF ACTION
**(Negligence: Respondent Superior)**

171.    Plaintiff repeats and realleges the factual allegations contained in paragraph 1-170 with the same force and effect if fully set forth herein.

172.    Defendants The City Of New York and the NYC DOE are responsible for operating New York City's public schools and protecting the students who attend those schools.  These municipal entities have chosen to allow uniformed officers of the NYPD to administer security procedures that require them to interact directly with minor children.

173.    Defendants The City Of New York and the NYC DOE owed Plaintiff a special duty of *in loco parentis*, by virtue of assuming physical custody and control over students attending the school, obligating them to exercise such care of their charges as a parent of ordinary prudence would observe in comparable circumstances.  The NYPD likewise owed Plaintiff a duty of *in loco parentis* by having its officers assume physical control over students for the duration of the school's entry and security procedures.

174.    Defendants thus owed Plaintiff a duty to ensure she was protected while in their care, including that relevant rules and regulations concerning student protection were followed and that threats from the negligence of employees or third parties would be anticipated and addressed.

175.    Upon learning of issues that had caused M.K. to be subjected to an improper search while undergoing security procedures at John Adams High School, Defendants duty of care included taking steps to make sure that such procedures were changed to ensure that M.K. and other students would be protected, and to ensure that M.K. would not be subjected to further injury.

176.    In undertaking to perform security procedures at John Adams High School, Defendants were engaged in proprietary functions at the school and managing its security procedures.

177.    The City of New York and the NYC DOE, by and through the conduct of their respective supervisors and employees, breached their duty to Plaintiff through, at a minimum, the following acts and omissions:

    a.  Failing to adequately supervise NYPD officers working the school's entry procedures;

    b.  Conditioning admission to John Adams on compliance with the scanning procedures in violation of the Chancellor's Guidelines;

    c.  Standing by, with no attempt to intervene, as NYPD officers conducted a strip-search of Plaintiff that was in clear violation of the Chancellor's Guidelines;

    d.  Forcing Plaintiff to undergo an interview following the strip-search without first notifying Plaintiff's mother;

    e.  Pressuring Plaintiff to take responsibility in her written statement for Defendants' improper search;

    f.  Failing to review Plaintiff's statement with Plaintiff's mother;

    g.  Failing to take action to prevent repeated mis-identifications of Plaintiff or to otherwise protect Plaintiff from further injury, even after being put on notice by Plaintiff's mother;

    h.  Refusing to enact reasonable accommodations to minimize further injury to Plaintiff; and

      i.    Failing to adequately conduct and/or supervise the investigation of Plaintiff's claim.

178.    The City of New York and the NYC DOE, through the conduct of their respective supervisors and employees, breached their duty to Plaintiff through, at a minimum, the following acts and omissions:

    a.    Failing to ensure that scanning equipment used at John Adams is in working order;

    b.    Failing to enact procedures to record incidents of student misconduct, including incidents involving students being caught with contraband;

    c.    Failing to adequately train or supervise officers charged with school security duties to ensure compliance with NYPD and NYC DOE policies and otherwise;

    d.    Allowing officers to target students for searches based on assumptions about prior misconduct;

    e.    Mis-identifying Plaintiff as a problem student in need of increased screening;

    f.    Failing to take steps to address and correct the mis-identification of Plaintiff, including ensuring that officers inclined to subject Plaintiff to further screening were apprised of the mis-identification;

    g.    Conducting a strip-search of Plaintiff;

    h.    Failing to adequately investigate Plaintiff's complaints; and

    i.    Upon information and belief, failing to take any action with respect to the officers responsible for illegally targeting and searching Plaintiff.

179.    As a direct and proximate result of Defendants' breaches, Plaintiff has suffered injury, including but not limited to emotional distress and pain and suffering.

180.    Plaintiff will continue to suffer further injury in the event she is required to undergo John Adams' arbitrary entry procedures in the fall semester.

181.    Accordingly, Plaintiff is entitled to monetary damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(Negligent Training and Supervision)**

182.    Plaintiff repeats and realleges the factual allegations contained in paragraph 1-181 with the same force and effect if fully set forth herein.

183.    Defendants here were engaged in proprietary functions – operating a school and managing its security procedures.  As such, Defendants owed a duty of care to train and supervise its staff to ensure relevant rules and regulations were followed.

184.    To the extent that Defendants are deemed to have acted in a governmental capacity in undertaking to perform security procedures at John Adams High School, Defendants are liable for their negligent training and supervision of their employees.  Defendants owed Plaintiff a special duty of *in loco parentis*, by virtue of assuming physical custody and control over students placed in the care of the school.

185.    The City of New York and the NYC DOE breached their duty to Plaintiff by, at a minimum, failing to adequately train and supervise school officials and employees to ensure that students were adequately protected from unconstitutional, improper searches and other misconduct, including but not limited to training about NYC DOE and NYPD rules, regulations, and policies concerning:

     a.  The prohibition of strip-searches in schools;
     b.  The non-mandatory nature of the school scanning procedures;
     c.  Proper procedures for the screening of students upon their entry to school each day, including school officials' roles in supervising and/or interacting with NYPD officers acting as security guards;
     d.  Proper procedures for investigating, reporting, and documenting student misconduct and violations; and
     e.  Proper procedures for interviewing and taking written statements from students.

186.    The City of New York and the NYPD breached their duty to Plaintiff by, at a minimum, failing to adequately train and supervise employees working in schools, including as security officers, to ensure that students were adequately protected from unconstitutional, improper searches and other misconduct, including but not limited to training about NYC DOE and NYPD rules, regulations, and policies concerning:

a. The prohibition of strip-searches in schools; and

b. The non-mandatory nature of the school scanning procedures;

c. Proper procedures for the screening of students upon their entry to school each day, including school officials' roles in supervising and/or interacting with NYPD officers acting as security guards; and

d. Proper procedures for investigating, reporting, and documenting student misconduct and violations.

187.    As a direct and proximate result of Defendants' breaches, Plaintiff has suffered injury, including but not limited to emotional distress and pain and suffering.  Plaintiff will continue to suffer further injury in the event she is required to undergo John Adams' arbitrary entry procedures in the fall semester.

188.    Accordingly, Plaintiff is entitled to monetary damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants and requests the following relief:

1.    A judgment declaring that the actions of the Defendants violated Plaintiff's Fourth and Fourteenth Amendment rights;

2.    Injunctive relief, including enjoining Defendants from forcing Plaintiff to continue undergo metal detector scanning and other John Adams entry procedures, and/or requiring Defendants to put in place policies and procedures to ensure that illegal and/or unconstitutional searches, including strip searches, do not occur in New York City schools;

3.    Compensatory damages in an amount to be determined at trial;

4.    Punitive damages in an amount to be determined at trial

5.    Attorneys' fees and costs; and

6.    Such other and further relief as the Court may deem just and proper.

32

Dated: New York, New York
       August 31, 2023

Respectfully submitted,

DENTONS US LLP

*/s/ Gary Meyerhoff*
Gary Meyerhoff
Cody Anthony (awaiting admission)
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
gary.meyerhoff@dentons.com
cody.anthony@dentons.com
*Attorneys for Claimant M.K.*