```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
M.K., *a minor, by and through her mother*                  :
*Sharmil Surujnath*,                                        :
                                                            :  **MEMORANDUM DECISION AND**
                              Plaintiff,                    :  **ORDER**
                                                            :
         -against-                                          :  23-cv-6579 (BMC)
                                                            :
THE CITY OF NEW YORK, *et al.*,                             :
                                                            :
                              Defendants.                   :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

This case joins special-use Fourth Amendment doctrine with more familiar state tort law. Plaintiff is a minor who claims she was subjected to an overly intrusive, under-the-clothing search by three school officials. Appearing through her mother, she brought one federal and several state claims against defendants – the officials, another administrator, and two municipal entities.

Before me are defendants' motion for summary judgment on plaintiff's claims and plaintiff's cross-motion for partial summary judgment on a state procedural defense. Material issues of fact preclude summary judgment on plaintiff's federal claim because, accepting her version of the facts, the search was overly intrusive relative to the circumstances and violated clearly established constitutional law. The state claims, on the other hand, fail as a matter of law because plaintiff has not articulated redressable theories of negligence. Defendants' motion is accordingly denied on plaintiff's federal claim but granted on the state claims, and plaintiff's motion is denied as moot.

**BACKGROUND**

Upon arriving to school each morning, students at John Adams High School must empty their pockets, place their bags on a scanner, and walk through one of three metal detectors at the school's entrance. The process is "Phase One" of the school's three-phase security protocol. The NYPD officers manning these detectors either clear the students to enter the school or flag them for Phase Two, at which point officers use a handheld metal detector, a "hand wand," to isolate what set off the first detector. Students who are not cleared after Phase Two are sent to Phase Three. The parties dispute what Phase Three typically entails, but at a minimum students are escorted to a private room with NYPD officers and school officials who question the student. A designee from the principal's office remains present "to make sure the student's rights aren't violated" and "that there's [sic] no strip searches."

When she was searched, plaintiff M.K. was a fifteen-year-old ninth grader at John Adams. She claims to have been a model student with no disciplinary record, but she had an admitted problem with the school's metal detectors. The culprit, she says, was an underwire bra she often wore. M.K. testifies that she was flagged for the Phase Two screening roughly half of the mornings she arrived at school that year – over one hundred times. The officers usually cleared her for class, but on four occasions officers moved her to Phase Three: twice in December 2022, once in January 2023, and once in November 2023. The first time, school officials sent her home to change, and she was cleared to return later that day. The second time, an official waved her through, satisfied by the hand-wand scan that "it was the bra."

The third of these incidents is the important one. It began when M.K. set off a Phase One detector manned by NYPD officer Defendant Vidalina Lopez. Lopez asked M.K. to walk through the same machine twice more, and the machine lit up both times. Moving M.K. to Phase

2

Two, Lopez conducted a hand-wand scan, which according to her detected metal in M.K.'s "chest/bra area." Lopez then sent M.K. back through a different metal detector, which again detected metal, and ultimately to a Phase Three private room. In this private room were Lopez; defendant Jessica Sirakowski, dean of the school; and defendant Arlene Marsh, an NYPD officer senior to Lopez (collectively, the "Phase Three defendants"). The parties dispute whether Sirakowski ordered Lopez to search M.K. and how long Marsh stayed in the room, but they do not dispute that Lopez asked M.K. to lift her shirt and that M.K. did so, exposing her bra and stomach.

After the search, defendant Adam Pashko, the assistant principal, asked M.K. to write a statement. M.K.'s mother filed an administrative complaint. And M.K. was sent to Phase Three for a fourth time later in the year. That time, instead of asking her to lift her shirt, the on-duty officer asked her to "bend forward a bit" and lift her bra up under her shirt. Nothing fell out.

In the operative amended complaint, M.K. asserts five causes of action. Count One, asserted against the Phase Three defendants, is a claim under 42 U.S.C. § 1983 alleging that the third search violated M.K.'s Fourth and Fourteenth Amendment rights. The remaining four counts are state tort claims asserted against various combinations of the Phase Three defendants, Pashko, the City of New York, and the New York City Department of Education. I address first the § 1983 claim before turning to the state claims.

## DISCUSSION

I.  **Section 1983 Claim**

   A. <u>Legal Framework</u>

The Fourth Amendment enshrines "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures," U.S. Const, amend IV, and the Fourteenth

Amendment prohibits state officers from violating that right.  See Elkins v. United States, 364 U.S. 206, 213 (1960).  Because "the ultimate touchstone of the Fourth Amendment is reasonableness," officers generally must have "probable cause to conduct [a] search."  United States v. Bodnar, 37 F.4th 833, 838 (2d Cir. 2022) (cleaned up).  But the well-worn probable cause standard does not apply to in-school searches of students by school officials.  "[T]he school setting 'requires some modification of the level of suspicion of illicit activity needed to justify a search,'" and courts thus apply a two-step test that "stops short of probable cause." Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 370 (2009) (quoting New Jersey v. T.L.O., 469 U.S. 325, 341 (1985)).  The test strikes a balance between "the schoolchild's legitimate expectations of privacy" and the "substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds."  T.L.O., 469 U.S. at 339.

At step one, a court determines whether the search was "justified at its inception."  Id. at 341-42.  A search is so justified when the school officials had some "reasonable suspicion that a particular regulation or law has been violated, with the search serving to produce evidence of that violation."  Phaneuf v. Fraikin, 448 F.3d 591, 596 (2d Cir. 2006) (quotation omitted).  Although this standard stops short of probable cause, it is no rubber stamp.  If probable cause requires a "substantial chance" of wrongdoing, reasonable suspicion still requires a "moderate chance." Safford, 557 U.S. at 371.  At step two, the court evaluates whether the search was "reasonably related in scope to the circumstances which justified the interference in the first place."  T.L.O., 469 U.S. at 341 (quotation omitted).  There are twin dimensions to the second-step inquiry: whether the "measures adopted" are tailored to "the objectives of the search" and whether they are "excessively intrusive in light of the age and sex of the student and the nature of the infraction."  Id. at 342.  In practice, the two steps are interrelated – "as the intrusiveness of the

4

search of a student intensifies, so too does the standard" for reasonable suspicion. Phaneuf, 448 F.3d at 597 (quotation omitted); see also Safford 557 U.S. at 377.

The Supreme Court first articulated and applied the bespoke school-search test in New Jersey v. T.L.O. There, a high school administrator searched a student's purse twice after she was accused of smoking in the school's bathrooms. He first looked inside her purse and saw a package of cigarettes. When he was removing the cigarettes from her purse, he also saw cigarette rolling papers, prompting a more thorough inspection which revealed drugs and drug paraphernalia.

The Court held that neither search offended the Fourth Amendment. The administrator had reasonable suspicion to conduct the first search based on the accusation that the student was smoking in the bathroom, and the search, although somewhat intrusive, was reasonably tailored to the circumstances because the student denied smoking. Discovering cigarettes on her person "would both corroborate the report that she had been smoking and undermine the credibility of her defense to the charge of smoking." 469 U.S. at 345. The same was true of the second search. The rolling papers indicated the presence of marijuana, which in turn "justified further exploration of [her] purse . . ." Id. at 347.

Over two decades later, the Second Circuit relied on T.L.O. to rule unconstitutional a "strip search" of a high school student. See Phaneuf, 448 F.3d 591. Responding to a classmate's report that the student was hiding marijuana in her pants, the school called in the student's mother to take off the student's exterior clothing, direct the student to pull her underwear from her body, and look for drugs. The panel held that the search failed the T.L.O. test at the first step. The examination was so intrusive, it reasoned, that the classmate's uncorroborated

5

accusation, the student's past disciplinary history, and the discovery of cigarettes in the student's purse could not have supported reasonable suspicion.

Soon after Phanuef, the Supreme Court also held that an in-school strip search violated the Fourth Amendment. See Safford, 577 U.S. 364. Emphasizing the "obviously different meaning of a search exposing the body from the experience of nakedness or near undress in other school circumstances" and "the degradation [the] subject" of a strip search "may reasonably feel," it concluded that a school did not have reasonable suspicion to require a student to "pull her bra out and to the side and shake it, and to pull out the elastic on her underpants, thus exposing her breasts and pelvic area to some degree." Id. at 369, 375, 377. It did not matter that the student was reportedly distributing prescription-strength ibuprofen to her classmates or that the vice principal found "several knives, lighters, a permanent marker, and a cigarette" in the student's day planner. Id. at 368. "[A] reasonable search that extensive calls for suspicion that it will pay off." Id.

B. Constitutionality of the Search

Construed in the light most favorable to M.K., the record depicts a search falling well short of what the Fourth Amendment demands. Before conducting the search, Lopez knew that M.K. had triggered the Phase One metal detector three times that morning, but she also knew that M.K. claimed to wear an underwire bra that often tripped the detectors. Lopez knew that the Phase Two hand wand detected metal in M.K.'s bra area. It is reasonable to infer that Lopez relayed all this information to Marsh and Sirkowski. And, from the security footage, it is likewise reasonable to infer that all three officials could see that M.K. did not appear to have anything under her shirt.

Perhaps, on these facts, there was *some* possibility that MK was carrying a weapon, a vape, or another metallic item violative of school policy. However, that remote probability is far from the "moderate chance" of wrongdoing demanded by the T.L.O. test's first step. There were no reports that M.K. was armed or carrying drugs. M.K. had a spotless disciplinary record.[1] There was no bulge in her shirt or other visible indicator of illicit contraband. Most importantly, unlike the administrator in T.L.O., the Phase Three defendants had no reason to disbelieve M.K. that her underwire bra set of the detectors; the hand wand substantiated her story.

The slim possibility that M.K. posed some danger to her classmates looks even slimmer when measured against the intrusiveness of the search at step two. M.K.'s "subjective expectation of privacy against such a search is inherent in her account of it as embarrassing, frightening, and humiliating." Id. at 375-76. No high school student reasonably expects to expose her naked stomach and bra to school officials. Especially not when, as here, the school's own policies prohibit such searches and when the student had previously triggered the metal detector "hundreds" of times without issue.

The parties spill much ink debating whether the examination was in fact a strip search like the ones in Phaneuf and Safford. In defendants' view, the demanding version of the reasonable-suspicion standard applied in those cases is inapposite when a student was not subjected to a strip search. This quibble is doctrinally meaningless.[2] School officials' in-school

---

[1] Admitting that, during the first Phase Three search a month prior, the security guards thought she had previously been caught with a vape, M.K. maintains that her mother cleared everything up with the school and that the rumor was dispelled by the second Phase Three search. Thus, resolving all factual disputes in her favor, I assume her disciplinary record was clean at this point.

[2] Though it seems clear that M.K. has the better argument. The Second Circuit has never squarely defined the term, but several other circuits have held that ordering a suspect to expose her underwear is a "strip search." See e.g., Justice v. City of Peachtree City, 961 F.2d 188 (11th Cir. 1992). And a host of states adopt that definition in their state codes. See, e.g., Cal. Penal Code § 4030; Conn. Gen. Stat. § 54–33k; 725 Ill. Comp. Stat. 5/103-1; Mo. Rev. Stat. § 544.193; N.J. Stat. Ann. 2A:161A-3; Va. Code Ann. § 19.2-59.1; Wash. Rev. Code § 10.79.070.

searches of students are all governed by the same two-step standard set out in T.L.O, which itself involved only a search of a purse. The highly intrusive nature of a so-called "strip search" simply triggers a correspondingly exacting review of the school officials' justifications.

Defendants do not seriously dispute that the search here was extraordinarily invasive. Asking a fifteen-year-old ninth-grader to expose her bra and bare stomach raises concerns virtually identical to those discussed in Safford and Phaneuf. M.K.'s "adolescent vulnerability" was "intensifie[d] [by] the patent intrusiveness of the exposure"; "[t]he common reaction of these adolescents simply registers the obviously different meaning of a search exposing the body from the experience of nakedness or near undress in other school circumstances," such as changing for gym class. Safford, 557 U.S. at 375. True, M.K. might have experienced somewhat more indignity had she been forced to pull her underwear away from her body like the students there, but the relatively weaker basis for suspicion steers me to the same conclusion.

At the very least, the search was far more intrusive than the searches in the two cases defendants cite, both of which involved male students exposing small sections of their midriff near their waistbands. See Vassallo v. Lando, 591 F. Supp. 2d 172, 196-197 n. 18 (E.D.N.Y. 2008) ("[The school officials] directed K.V. to lift the bottom of his t-shirt to expose his waistband."); Vlahopolous v. Roslyn Union Free Sch. Dist., No. 21-cv-0063, 2024 WL 1242087, *3 (E.D.N.Y. Mar. 22, 2024) ("Searching a student's shoes, socks and sweatshirt, and the exposure of a student's ankles and waistband does not constitute a strip search."). And those searches rested on grounds much firmer than the scant evidence tying M.K. to any violation of school policy. In Vassallo, classmates reported that the student started a fire in the bathroom, a teacher saw the student running away from the school, and administrators found drugs in the student's backpack. In Vlahopolous, the student was previously disciplined for vaping, bullying,

8

and fighting, and classmates provided administrators with images of the student with drugs and paraphernalia.

Defendants advance one final alternative argument on the constitutionality of the search. They argue that, to the extent the search was unconstitutional, only Lopez can be held liable because she was the one who ordered M.K. to lift her shirt; the other two defendants were not "personally involved." See Littlejohn v. City of New York, 795 F.3d 297, 314 (2d Cir. 2015). That may well be true, but it is not a determination I can make at this stage. On M.K.'s account, both Marsh and Sirakowski were present during the search, Sirakowski nodded at Lopez before the search, and Marsh was Lopez's supervising officer. It is reasonable to infer from these facts that both directly participated in the purported constitutional violation. Cf. Dettelis v. City of Buffalo, 3 F. Supp. 2d 341, 349 (W.D.N.Y.), aff'd, 166 F.3d 1200 (2d Cir. 1998) (an officer merely present during an allegedly unconstitutional search was not personally involved because he "was not the supervisor of the officers" who searched the plaintiff). Although Sirakowski denies that she gave any instruction and Marsh denies that she was even in the room, a jury need not credit either account. M.K.'s testimony supports a reasonable conclusion that both were personally involved.

C. Qualified Immunity

My work on the § 1983 claim is not yet finished. The Phase Three defendants also seek summary judgment on qualified immunity. A state official is entitled to qualified immunity unless "(1) . . . [they] violated a statutory or constitutional right, and (2) . . . the right was clearly established at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (quotation omitted). Having already determined that a reasonable jury could find a constitutional infirmity, I need only address the second prong.

9

The "clearly established" requirement protects objectively reasonable reliance on existing law.  See Lore v. City of Syracuse, 670 F.3d 127, 166 (2d Cir. 2012).  An officer's conduct is objectively reasonable when "officers of reasonable competence could disagree on [its] legality." Dancy v. McGinley, 843 F.3d 93, 106 (2d Cir. 2016).  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (cleaned up).  That said, "[i]t is not necessary . . . that the very action in question has previously been held unlawful."  Ziglar v. Abbasi, 582 U.S. 120, 151 (2017) (cleaned up).

When viewing the record in the light most favorable to M.K., I do not have much trouble concluding that the search was unlawful.  The second-order qualified-immunity question – whether on that record a reasonable person could have determined the search was lawful – is a closer one, but factual issues still stave off summary judgment.  I must credit's M.K.'s deposition testimony that she triggered the metal detectors multiple times a week, that she told the Phase Three defendants it was her under-bra wire triggering the alarm, and that they had no reason to believe otherwise.  This places the constitutional question beyond debate.

Sure, to the Court's knowledge, no case has squarely addressed whether the Fourth Amendment prohibits officials from searching a student by requiring her to expose her stomach and bra.  The qualified immunity test, though, is not *that* granular.  It asks only whether a reasonable person could read the caselaw in the state officers' favor, and the weight of authority here compels only one plausible conclusion: that "the content of the suspicion failed to match the degree of intrusion."  Safford, 557 U.S. at 375.  In T.L.O., the student was subject to particularized allegations of wrongdoing, there was good reason to disbelieve her denial of the accusations against her, and the search of her purse was categorically less invasive.  In Safford

10

and Phaneuf, more intrusive searches were ruled unconstitutional despite the school officials having far more reason to suspect the students of wrongdoing. And the searches in Vassallo and Vlahopolous were categorically less intrusive and based on stronger suspicion.

To clarify, nothing in the record suggests that the Phase Three defendants acted with malintent. I am virtually certain, in fact, that they acted with a singular desire to protect M.K.'s classmates and to enforce school policy in good faith. It is simply the case that their subjective good intentions do not entitle them to qualified immunity, which turns on objective reasonableness. With all disputes resolved in M.K.'s favor, the summary-judgment record compels the conclusion that the search was not objectively reasonable. The § 1983 claim will therefore proceed to trial, and I will give to the jury special interrogatories allowing me to rule on the Phase Three defendants' immunity as a matter of law.

## II.     State Claims

As for the remaining state claims, defendants have moved for summary judgment on each, and M.K. has moved for partial summary judgment on one of defendants' procedural defenses. I need not address the procedural defenses because defendants are entitled to summary judgment on the merits.

The four state claims all rest on a single theory: *in loco parentis*. "In New York, schools are under a special duty of in *loco parentis*." Hammond v. Lincoln Tech. Inst., Inc., No. 10-cv-01933, 2012 WL 273067, at *6 (E.D.N.Y. Jan. 30, 2012). That is, "by virtue of assuming physical custody and control over their students and effectively taking the place of parents and guardians, schools must adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision." Doe v. Poly Prep Country Day Sch., No. 20-cv-04718, 2022 WL 4586237, at *10 (E.D.N.Y. Sept. 29,

2022) (quotation omitted). Counts II through V each advance a different flavor of *in loco parentis*. Counts II and III, asserted against the Phase Three defendants and Pashko, allege that the individual defendants were negligent and grossly negligent, respectively, in their treatment and supervision of M.K. Count IV seeks to hold the two entity defendants – the City of New York and the New York City Department of Education – liable for those breaches under a theory of *respondeat superior*. And Count V alleges the entity defendants directly breached their own duty to M.K. through negligent supervision of the individual defendants.

These muddled and overlapping claims all fail. First, the individual defendants cannot be held directly liable for negligence or gross negligence. M.K. seeks to recover for "emotional distress" and "pain and suffering." She has provided evidence of that emotional distress and its physical manifestations. But, under New York law, a plaintiff seeking to recover such damages must do more. She must demonstrate a "breach of a duty owed to [her] *which exposes . . . her to an unreasonable risk of bodily injury or death*" and that the breaching conduct was *"[e]xtreme and outrageous*." Calicchio v. Sachem Cent. Sch. Dist., 185 F. Supp. 3d 303, 314 (E.D.N.Y. 2016) (quotations omitted, emphasis added).

None of the conduct culled in the amended complaint fits this description. If M.K. is right that the individual defendants coerced her to write a whitewashed statement of the events, subjected her to repeated invasive searches, and failed to properly investigate the incident, they certainly treated her indecently, and they may have breached their *in loco parentis* duties. Yet no evidence suggests that they put M.K. in any risk of actual physical danger or that they acted "so outrageous[ly] in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232 (1983). No

reasonable jury could hold individual defendants liable for negligence, gross or otherwise, without such a showing.

The claims against the entities fare no better. Count IV relies on *respondeat superior*, a theory of vicarious liability. "An employer is vicariously liable under the doctrine *of respondeat superior* for injuries resulting from the negligence of employees acting within the scope of their employment." McDuffie v. Wilner, 415 F. Supp. 2d 412, 419 (S.D.N.Y. 2006). The claim, then, falls alongside the claims against the individual defendants.

Nor can M.K. prevail on Count V, the supervisory liability claim. Preliminarily, it is unclear that a school could even be held liable for negligently failing to supervise its employees who unconstitutionally searched a student. See Sarnicola v. Cnty. of Westchester, 229 F. Supp. 2d 259, 276-77 (S.D.N.Y. 2002). Regardless, when seeking to hold a school district liable for injuries caused by another individual's intentional conduct, a plaintiff "must demonstrate the school's prior knowledge or notice of the individual's propensity or likelihood to engage in such conduct" or, absent such knowledge, that "the danger and risk of harm could have been reasonably foreseen and prevented by the institution." Poly Prep, 2022 WL 4586237, at *11 (quotation omitted).

The record here supports neither conclusion. It is true that M.K. had been pulled into Phase Three screening twice before the unconstitutional search, but there were no warning signs that any of the searching officers would have conducted such an invasive search. The entity defendants therefore cannot be held liable for negligent supervision.

13

## CONCLUSION

For these reasons, defendants' motion for summary judgment is granted on the state claims and denied on the § 1983 claim, and plaintiff's cross motion for summary judgment is denied as moot.

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
   May 29, 2025